**FILED**
1st JUDICIAL DISTRICT COURT
Rio Arriba County
3/20/2019 1:49 PM
STEPHEN T. PACHECO
CLERK OF THE COURT
Tamara Snee

**STATE OF NEW MEXICO**
**COUNTY OF RIO ARRIBA**
**FIRST JUDICIAL DISTRICT COURT**

**DEBORAH GRAY, as Guardian ad litem of**
**R.B., a minor child,**

      **Plaintiff,**

**vs.**

No. <u>D-117-CV-2019-00134</u>

Case assigned to Wilson, Matthew Justin

**ACADIA HEALTHCARE COMPANY, INC.,**
**And ROLLING HILLS HOSPITAL, LLC,**

      **Defendants.**

## COMPLAINT FOR PERSONAL INJURIES

COMES NOW Plaintiff Deborah Gray, as Guardian ad litem of R.B., a minor child, by and through her attorneys, FADDUOL, CLUFF, HARDY & CONAWAY, P.C. (Joshua K. Conaway) and MARTINEZ, HART, THOMPSON, & SANCHEZ. P.C. (F. Michael Hart & Kelly Stout Sanchez) and for her Complaint for Personal Injuries against Defendants STATES:

### I. PARTIES, JURISDICTION, AND VENUE

1. R.B. is in the custody and care of the State of New Mexico.

2. Plaintiff Deborah Gray is an attorney who was appointed Guardian ad litem of R.B and is a proper party to bring this action on her behalf. Plaintiff is a resident of the County of Bernalillo, State of New Mexico.

3. Defendant Rolling Hills Hospital, LLC ("Rolling Hills"), is a foreign limited liability company with a registered agent, The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

4. Upon information and belief, Defendant Acadia Healthcare Company, Inc. ("Acadia") is a foreign registered corporation with a registered agent located at CT Corporation System, 206 S. Coronado Avenue, Española, New Mexico 87532-2792.

**EXHIBIT**
**2**

5. Upon information and belief, Rolling Hills is a wholly-owned subsidiary of Acadia.

6. Upon information and belief, Acadia operates a licensed Oklahoma residential treatment center, Rolling Hills, that purports to serve children with a range of mental, emotional, addiction, and behavioral issues.

7. Rolling Hills has purposefully availed itself of the benefits of the New Mexico market by using CYFD as a referral source to send New Mexico adolescents to be housed at Rolling Hills.

8. Rolling Hills' conduct in connection with New Mexico is such that it should anticipate being haled into New Mexico court because it encourages referral of New Mexico adolescents to its facility and houses New Mexico adolescents in its residential treatment center.

9. Rolling Hills maintains an interactive website where New Mexican residents can contact Rolling Hills and place New Mexico adolescents at Rolling Hills for residential treatment.

10. Rolling Hills targets New Mexico adolescents by encouraging CYFD to refer such youth to its facility for residential treatment.

11. Plaintiff's claims arise out of Rolling Hills' contacts with New Mexico and its purposeful availment of conducting business in New Mexico by providing residential treatment to New Mexico adolescents.

12. It is fair and reasonable to exert personal jurisdiction over Rolling Hills.

13. Jurisdiction and venue are proper with this Court.

## II. GENERAL FACTS COMMON TO ALL CLAIMS

14. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

**Background of Addiction and Mental Health in the United States**

15. In 2008, the United States Congress passed the Mental Health Parity and Addiction Equity Act ("Act"). The Act required health plans and insurers to pay for addiction and mental illness treatment just as they would for cancer or cardiovascular disease.

16. Two (2) years later, Congress passed the Patient Protection and Affordable Care Act ("ACA"), commonly referred to as "Obamacare".

17. These two (2) laws created a shift of behavioral health funding from State budgets to insurance.

18. With the ACA in place – and its requirement for coverage of mental health and drug abuse – the swelling numbers of insured persons combined with the opioid epidemic sweeping the nation, kicked off a mental health gold rush.

19. Mental health investments quintupled, with Americans' addiction to drugs spelling opportunity for private equity firms.

**General Information About Defendant Acadia Healthcare Company, Inc.**

20. Defendant Acadia Healthcare Company, Inc., was established in 2005 to develop and operate a network of behavioral health facilities across the country. It provides psychiatric and chemical dependency services.

21. Acadia operates a network of 586 behavioral health facilities with approximately 18,000 beds in 40 states, the United Kingdom, and Puerto Rico.

22. In 2012, Acadia's revenue was $413 million. That number swelled to $1.038 billion in 2014. In 2018, Acadia has reported revenue of $2.268 billion through September.

**Background of Joey Jacobs**

23. At all times relevant here, Defendant Joey Jacobs was the Chairman and CEO of Acadia and oversaw the growth of Acadia following the enactment of the Affordable Care Act. Jacobs had been the head of Acadia since 2011.

24. In 1997, Jacobs co-founded Psychiatric Solutions, Inc. ("PSI") and served as its President and CEO from 1997 until 2010. Before founding PSI, he served for 21 years in various capacities with Hospital Corporation of America ("HCA").

25. Jacobs initiated a plan whereby PSI would fill up as many beds as possible with as little staff as possible, causing profits to soar.[1]

26. Former PSI employees have characterized the culture as: " 'It's a pattern of behavior driven totally by the almighty dollar,' said Chad Thompson (who worked at an admissions office at Sierra Vista when PSI took over) . . . 'It's not a client-centered approach. It's a money-centered approach.' "[2]

27. In September of 2009, shareholders of PSI filed a derivative lawsuit against PSI for failing to disclose adverse facts about the company and for false promises regarding the success of the company, which artificially inflated the supposed values of the company shares. The shareholders also alleged that PSI had "suffered from systemic quality of care and patient safety problems" for years.[3]

28. "The complaint allege[d] that PSI failed to sufficiently staff its facilities, resulting in alarming incidents of abuse, neglect, and even the death of its patients, and downplayed the significance of these events when they became public."[4]

29. Jacobs showed up several times within the lawsuit, always with empty promises:

---

[1] *See* Christina Jewett & Robin Fields, "Psychiatric Care's Peril and Profits" (dated November 22, 2008), *available at*: https://www.propublica.org/article/psychiatric-cares-perits-and-profits-psychiatric-solutions-inc.
[2] *See* Christina Jewett & Robin Fields, "Psychiatric Care's Peril and Profits" (dated November 22, 2008), *available at*: https://www.propublica.org/article/psychiatric-cares-perits-and-profits-psychiatric-solutions-inc.
[3] Complaint for Violation of Federal Securities Laws, *Garden City Employees' Retirement Sys. v. Psychiatric Solutions, Inc., Joey Jacobs, et al.*, in United States District Court Middle District of Tenn., Nashville Division (dated September 21, 2009).
[4] "Shareholders Obtain $65 Million Settlement in Psychiatric Solutions" (dated January 17, 2015), *available at:* https://www.rgrdlaw.com/news-item-65-million-psychiatrict-solutions.html.

- "... we constantly are improving the safety, looking at ways to improve the safety, quality, meeting standards and regulations."

- "... compliance for us starts at the single employee taking care of that single patient. And it's the responsibility of the CEO at that facility to make sure they are in compliance and great quality there."

- "... if we internally classify it as a grave incident ... we immediately begin a root-cause analysis to see if there is a way we can improve the facility and improve the process there. . . ."

- "Minimizing and eliminating these type of incidents is one of PSI's top priorities. We take continuous improvement of quality, safety and risk management very seriously and we have built a very effective infrastructure over the past several years."[5]

30. Jacobs seemingly ignored these issues and would refer to incidents at PSI facilities as "creat[ing] noise for us."[6]

31. Jacobs was responsible for shaping this corporate culture of putting profits first and under his control PSI went from a revenue of $114 million in 2002 to $1.8 billion in 2009.

32. PSI's lack of quality care and poor corporate culture was documented in a report prepared by the University of Illinois at Chicago's for the DCFS:

> There is compelling data about the tendency of this organization's leadershi9p to avoid taking direct responsibility for longstanding and reoccurring clinical/administrative failures – in effect, placing the onus for the chronic quality of care problems downward: first onto the hospital staff 'who do not perform their duties'; [and] second, onto mentally ill patients who 'refuse to comply with the rules,' . . . .

---

[5] Complaint for Violations of Federal Securities Laws, at 17-18, *Garden City Employees' Retirement Sys. V. Psychiatric Solutions, Inc., Joey Jacobs, et al.*, in United States District Court Middle District of Tenn., Nashville Division (dated September 21, 2009).

[6] Complaint for Violations of Federal Securities Laws, at 17-18, *Garden City Employees' Retirement Sys. V. Psychiatric Solutions, Inc., Joey Jacobs, et al.*, in United States District Court Middle District of Tenn., Nashville Division (dated September 21, 2009).

Such resistance to critical self-examination, and the organizational tendency to 'blame downward' and/or 'outward' when quality of care problems arise, is by no means limited to Riveredge officials. In fact, the earlier brief review of similar problems in PSI facilities around the United States shows a corporate culture operating from one crisis to the next – always primed to immediately spring into action to fix problems that were otherwise ignored until yet another crisis eventually forces attention to be paid.[7]

33. Jacobs left PSI in November 2010.

**Jacobs Takes Over at Acadia**

34. In February of 2011, Jacobs took over at Acadia as the Chairman of the Acadia board and CEO. He served in this capacity until December 17, 2018, when he was removed.

35. All but one of his current corporate officers of Acadia is a previous owner and/or officer of PSI, therefore, ensuring that the culture initiated by Jacobs at PSI continues on at Acadia.[8]

36. When Jacobs took over Acadia in 2011, Acadia had about six (6) facilities.

37. With private equity money flooding mental health and addiction services, Jacobs capitalized on the steady stream of income available.

38. Acadia now has close to 600 facilities worldwide.[9]

**Acadia Acquires Rolling Hills**

39. Acadia operates a treatment facility for children with a wide range of intellectual and developmental disabilities as well as behavioral issues called Rolling Hills.

---

[7] CCHR Internat'l, "Psychiatric Chain Under Investigation for Billing Fraud & Abuse in U.S. Now Buys U.S. Behavioral Facilities", at 5 (dated January 16, 2017), *available at*: http://www.cchrvictoria.org.au/psychiatrict-chain-under-investigation-for-billing-fraud-abuses.
[8] CCHR Internat'l, "Psychiatric Chain Under Investigation for Billing Fraud & Abuse in U.S. Now Buys U.S. Behavioral Facilities", at 5 (dated January 16, 2017), *available at*: http://www.cchrvictoria.org.au/psychiatrict-chain-under-investigation-for-billing-fraud-abuses.
[9] Margaret Newkirk, "Private Equity Sees No End to the Drug and Mental-Health Gold Rush (dated March 30, 2017), Bloomberg, *available at*: https://www.bloomberg.com/news/articles/2017-03-30/private-equity-rehab-romance-rages-amid-health-law-turmoil.

40. Rolling Hills claims its mission is to "provide superior behavioral healthcare services" with "Core Values" of "Integrity – honesty and fairness", "Respect – treat people as we wish to be treated", and "Excellence – providing the level of care we would want for a family member".

41. Rolling Hills "is proud to offer adolescent behavioral health services that are designed to stabilize young people who are battling emotional and behavioral concerns." It claims that its therapies and "treatment modalities" "allow young people to leave [its] hospital and become functioning, successful members of the community."

42. Rolling Hills claims its therapies are "designed to meet the needs of youth between the ages of 12 and 18 who are suffering from mental, behavioral, and/or emotional concerns."

43. It contends its program "specializes in the diagnosis and treatment of psychiatric conditions by providing a comprehensive range of services as part of [its] short-term stabilization treatment model".

44. Rolling Hills holds itself out as possessing a "caring and compassionate staff".

45. Rolling Hills promises "[b]y implementing individualized service plans that are tailored to address the unique concerns of each patient who is entrusted in our care, the staff at Rolling Hills Hospital in Ada, OK is able to help adolescents stabilize and develop the tools needed to maintain the highest level of functioning, all while remaining in a safe and healing environment that is conducive to healing."

46. Upon information and belief, Acadia acquired Rolling Hills in 2012.

47. Upon information and belief, Acadia controls the budget of Rolling Hills, sets benchmarks for profitability, and profitability determines the bonus the CEO will receive each year.

48. Additionally, upon information and belief, CEOs and other management of Acadia facilities, such as Rolling Hills, are employees of Acadia, not Rolling Hills.

49. Upon information and belief, when incidents occur at Rolling Hills, staff are required to call Risk Management at Acadia to report such incidents. Acadia determines what level of severity is assigned such incidents, which controls whether these incidents trigger mandatory reporting requirements to institutions such as the State of Oklahoma or the Joint Commission.

50. Rolling Hills management is trained at Acadia by Acadia personnel and Acadia's liability insurers in topics such as incident investigation and client management.

51. Acadia controls every aspect of Rolling Hills operations.

**Acadia Purposefully Avails Itself of the Benefits of Conducting Business in New Mexico, Including Filling Beds at Rolling Hills**

52. Upon information and belief, Rolling Hills obtains referrals from CYFD to place New Mexico adolescents, including R.B., into Rolling Hills for residential treatment.

53. As a result of the referral system, New Mexico youth are sent to Acadia facilities, including Rolling Hills, for residential treatment, by agencies, including CYFD.

54. Acadia, and its facilities, including Rolling Hills, purposefully avail themselves of the benefit of conducting business in New Mexico by purporting to serve New Mexico adolescents and provide them with residential treatment.

55. CYFD, as custodian, and acting *in loco parentis* to New Mexico adolescents, including R.B., place them into Acadia-run facilities, including Rolling Hills.

56. As a result of CYFD's referrals, Acadia is able to fill its facilities, including Rolling Hills, with New Mexico youth.

**Rolling Hills is the Alter Ego of Acadia**

57. The corporate compliance statement for Rolling Hills, on its website, lists an Acadia compliance officer as its compliance contact.

58. Upon information and belief:

a. Acadia owns all, or the majority, of the capital stock in Rolling Hills;

b. Acadia and Rolling Hills corporations have common directors or officers;

c. Acadia finances Rolling Hills and its budget;

d. Acadia subscribes to all the capital stock of Rolling Hills and/or otherwise caused its incorporation;

e. Rolling Hills has grossly inadequate capital;

f. Acadia pays the salaries and expenses and losses of Rolling Hills, including issuing pay checks to all Rolling Hills employees.

g. In the papers of Acadia, and its statement of Acadia officers, Rolling Hills is referred to as a subsidiary, department, or division of Acadia.

h. The directors and executives of Rolling Hills do not act independently in the interest of Rolling Hills but instead, not only take direction from Acadia, but, are, in the case of Rolling Hills' CEO and COO, are actual Acadia employees;

i. The formal legal requirements of Rolling Hills as a separate and independent corporation are not observed;

j. All of Rolling Hills' revenue goes to Acadia;

k. All capital expenditures are approved by Acadia;

l. Acadia negotiates employment contracts between Rolling Hills and hired employees.

59. Upon information and belief, the CEO and COO of Rolling Hills are Acadia employees.

60. Upon information and belief, the paychecks of all employees at Rolling Hills are paid by Acadia.

**General Background of R.B.'s Incidents**

61. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

62. In December of 2018, R.B. was placed in the custody of CYFD and was a ward of CYFD.

63. In approximately December of 2018, R.B. was placed in residential treatment at Rolling Hills.

64. While a resident at Rolling Hills, a staff member, Jason H., took advantage of his position of power and authority over R.B. and raped her.

65. Upon inquiry by the Rolling Hills Program Director, R.B. disclosed the rape and sexual abuse by Jason H.

66. As a result of the incidents occurring at Rolling Hills, R.B. sustained serious physical and mental injuries.

## III. COUNT I
### Alter Ego/Instrumentality
### (All Defendants)

67. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

68. Rolling Hills is the alter ego of Acadia.

69. The shareholders of Acadia have so manipulated Rolling Hills, and other Acadia subsidiaries, to serve their own individual interests that the identity of Acadia has merged with that of Rolling Hills, and other Acadia facilities.

70. Rolling Hills, and other Acadia facilities, are not operated in a legitimate fashion to serve the valid goals and purposes of Rolling Hills but, instead, function under the dominion, control of, and for the purposes of Acadia.

71. Rolling Hills, and other Acadia facilities, are mere business conduits for Acadia.

72. There is such unity of interest and ownership that the individuality and/or separateness of Acadia and Rolling Hills, as well as other Acadia facilities, has ceased.

73. Allowing acknowledgement of the separate corporate existence of Acadia from Rolling Hills, and its other Acadia facilities, would sanction fraud and/or other improper purposes.

74. In fact, the corporate compliance statement for Rolling Hills lists an Acadia compliance officer as its compliance contact:



75. The determination that shareholders are the alter egos of the corporation describes the specific situation here where the Acadia shareholders have so manipulated Rolling Hills to further their own individual interests that the identity of Rolling Hills has merged into its Acadia shareholders. That is to say, that Acadia and Rolling Hills have, in fact, become so closely identified that a court in ruling that the corporate entity should be disregarded is merely recognizing reality.

76. The Acadia shareholders have manipulated Rolling Hills to their own purposes, convenience, and benefit.

77. Acadia's control exercised over Rolling Hills is so complete as to render Rolling Hills the instrumentality of Acadia.

78. Upon information and belief:

   a. Acadia owns all, or the majority, of the capital stock in Rolling Hills;

   b. Acadia and Rolling Hills corporations have common directors or officers;

   c. Acadia finances Rolling Hills and its budget;

   d. Acadia subscribes to all the capital stock of Rolling Hills and/or otherwise caused its incorporation;

   e. Rolling Hills has grossly inadequate capital;

   f. Acadia pays the salaries and expenses and losses of Rolling Hills, including issuing pay checks to all Rolling Hills employees.

   g. In the papers of Acadia, and its statement of Acadia officers, Rolling Hills is referred to as a subsidiary, department, or division of Acadia.

   h. The directors and executives of Rolling Hills do not act independently in the interest of Rolling Hills but instead, not only take direction from Acadia, but, are, in the case of Rolling Hills' CEO and COO, are actual Acadia employees;

   i. The formal legal requirements of Rolling Hills as a separate and independent corporation are not observed;

   j. All of Rolling Hills' revenue goes to Acadia;

   k. All capital expenditures are approved by Acadia;

   l. Acadia negotiates employment contracts between Rolling Hills and hired employees.

79. Acadia has complete dominion over Rolling Hills, not only of finances, but also of policy and business practices so as to make it clear that Rolling Hills has not separate mind, will, or existence of its own.

80. Rolling Hills was operated with an improper purpose, including direction and participation by Acadia in improper activities and joint improper acts where, had Acadia and Rolling Hills performed these actions alone, would have created liability. Acadia used Rolling Hills to carry out unjust acts.

81. As a direct and proximate or legal result of Acadia using Rolling Hills has its alter ego, R.B. has been injured and has suffered physical and mental injuries.

## IV. COUNT II
## Civil RICO

82. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

83. Under the New Mexico Racketeering Act, "[a] person who sustains injury to his person, business or property by a pattern of racketeering activity may file an action in the district court for the recovery of three times the actual damages proved and the costs of the suit, including reasonable attorney's fees." N.M.S.A. 1978, § 30-42-6(A).

84. Defendants have committed predicate acts for racketeering:

> A. "racketeering" means any act that is chargeable or indictable under the laws of New Mexico and punishable by imprisonment for more than one year, involving any of the following cited offenses:
>
> ***
>
> (6) fraud, as provided in Section 30-16-6 NMSA 1978;
>
> ***
>
> (20) a violation of the provisions of Section 30-51-4 NMSA 1978;

N.M.S.A. 1978, § 30-42-3.

85. " '[P]attern of racketeering activity' means engaging in at least two incidents of racketeering with the intent of accomplishing any of the prohibited activities set forth in Subsections A

through D of Section 30-42-4 NMSA 1978; provided at least one of the incidents occurred after February 28, 1980 and the last incident occurred within five years after the commission of a prior incident of racketeering." N.M.S.A. 1978, § 30-42-3(D).

86. Racketeering is involvement in an enterprise with illegal or illicit activity. *See* N.M.S.A. 1978, § 30-42-3 (C)(defining "enterprise" as "a sole proprietorship, partnership, corporation, business, labor union, association or other legal entity or a group of individuals associated in fact although not a legal entity and includes illicit as well as licit entities."); N.M.S.A. 1978, § 30-42-4.

87. An enterprise may exist solely for the purpose of engaging in the two or more crimes constituting the pattern of racketeering [activity]. . . . And the evidence used to prove the existence of an enterprise may overlap with evidence of a pattern of racketeering activity." *State v. Rael*, 1999-NMCA-068, ¶ 10, 127 N.M. 347, 981 P.2d 280 (citation and quotation marks omitted).

88. A person injured by civil racketeering activity may recover "three times the actual damages proved and the costs of the suit, including reasonable attorney's fees." N.M.S.A. 1978, § 30-42-6(A).

89. Acadia is a criminal enterprise. Through Acadia's other enterprises, such as Rolling Hills, Acadia has engaged in civil racketeering activity.

90. Upon information and belief, Rolling Hills deposits all, or nearly all, income earned on a daily basis to Acadia and Acadia controls and directs all actions of Rolling Hills, to include staffing levels, resident levels, levels incidents are classified at, and financial decisions.

91. Specifically, upon information and belief, Acadia has committed fraud by making promises to ensure the safety of adolescent residents of Rolling Hills while intentionally understaffing

facilities and choosing not to provide adequate levels of staff, thereby endangering the safety of adolescent residents such as R.B..

92. Defendants have committed fraud and misused funds by misusing residents' insurance proceeds and coverage, have billed for services not received, including paying for staff who allowed residents to be beaten, abused, sexually assaulted, and elope from facilities.

93. Defendants committed fraud and misused funds by misusing residents' insurance proceeds and coverage by charging for services, such as assessments for placement done by staff unfamiliar with the DSM IV manual and failing to take into account residents' histories and physicals.

94. Defendants have committed fraud and misused funds by repeatedly hired unqualified persons with criminal histories and employment histories that should have disqualified them from working in Acadia facilities.

95. Defendants have committed fraud and misused funds by repeatedly failed to report incidents and/or downgraded the incident level of incidents that have occurred in facilities to avoid reporting incidents to authorities, governmental agencies, and residents' own parents and guardians, to hide the incidents occurring in facilities and to avoid losing residents and their insurance proceeds.

96. Defendants have committed fraud and misused funds by billing for services never provided, failing to keep residents safe, and subjecting residents to violence and sexual attack.

97. Upon further information and belief, Acadia has committed fraud by falsely and/or fraudulently advertising the safety of adolescent residents and Rolling Hills holding itself out as a residential treatment program despite providing inadequate levels of staffing and not providing for the safety of adolescent residents. Acadia and Jacobs have made these representations despite having knowledge of the multiple investigations, incidents of death,

sexual assault, physical assault, and complaints of understaffing nationwide at Acadia facilities. Upon information and belief, numerous patients and residents, including children and teenagers, have died due to Acadia's negligence. There are numerous, recurring, reports of sexual and physical abuse at Acadia facilities, some of which is carried on by employees of Acadia or Acadia-owned facilities:

- In 2007, in Arkansas, a five-year old boy was killed at Ascent Children's Health Services when Ascent employees left him in a hot van for 8 hours. Ascent is owned by Acadia. Ascent was already on probation due to another boy left unsupervised for hours and was found bloodied and bruised. The State of Arkansas later launched an investigation into incidents of alleged mistreatment of children.

- In Oklahoma, federal inspectors documented 64 separate violations at Rolling Hills Hospital since Acadia acquired it in 2012. Among the findings, inspectors determined that 26 deaths went unreported. Other complaints included assaults and rapes, and accusations that Acadia ordered its employees to remove security cameras and destroy video surveillance.

- In 2016, a lawsuit was filed against Valley Behavioral Health Systems and Acadia for the violent rape of a resident by another resident. Valley Behavioral Health allegedly placed a male patient with severe mental health issues in the same hall as female residents. The male patient grabbed a female patient, pulled her into a room, and violently raped her.

- In New Mexico, Acadia-owned Desert Hills Residential Treatment Center has been the subject of numerous complaints. In 2016, a young resident was allowed to escape from Desert Hills during a trip to a hospital because Desert Hills did not provide the

required number of employees to transport him. The young man was on the run for 3 days before being shot by a homeowner. Desert Hills has previous been the subject of numerous calls out to it by Albuquerque Police Department ("APD") for residents being on the roof of the facility. A sexually predacious resident was housed with a younger, more vulnerable resident and sexual abuse occurred. Another incident occurred where a young resident was raped by a male staff member and Desert Hills' response was to cover up the rape and merely send the staff member home for one (1) day and did not notify the mother of the young resident until a visit with the mother a few days later. Desert Hills has two (2) Acadia employees – the CEO and COO. Acadia sets the budget for Desert Hills and that budget governs how much staff can be at the facility at any given time. In 2014, the APD began to prepare to declare Desert Hills a public nuisance because of the number of calls to the facility. Rather than fix these issues, Desert Hills met with CYFD and received a waiver so APD no longer had to be called for incidents at Desert Hills.

- In Pennsylvania, the Philadelphia Police Department has responded at least 600 times between 2011 and 2016 to incidents at Acadia-owned Bellmont Behavioral Hospital.

- In Florida, Acadia-owned Park Royal Hospital has had similar complaints. In 2018, authorities were investigating two (2) patient deaths and a sexual assault. A former employee was convicted of raping 11 patients several years ago, rapes that the hospital could have prevented had it not ignored warning signs. A 2017 inspection determined that Park Royal is understaffed and cannot properly supervise patients, ignored complaints, and had poor quality control procedures in place. In 2014, inspectors cited Park Royal's failure to perform 15-minute checks required to keep patients safe. That failure lead to death and rapes.

- In Phoenix, Arizona, inspectors declared an immediate jeopardy situation at Acadia-owned Sonora Behavioral Health Hospital. It found that the hospital had inadequate staffing and nursing practices and environmental issues all of which contributed to the death of a patient by suicide. This is in addition to the deaths of multiple young patients, after which inspectors determined that one Acadia staff person working in the unit during these deaths was not qualified. Other investigations uncovered an assault on a vulnerable person that was not reported to the police or the parents, additional unqualified staff members, nurses drunk on the job, medication errors, improper use of physical restraints on patients, lack of patient supervision.

- In Tucson, Arizona, Acadia-owned Sierra Tucson has had several incidents as a result of violations of policies and procedures. For example, policies and procedures require staff to go to a resident's living quarters if the resident is more than 15-minutes late for a class. On several occasions, residents were late, and no one checked on them. Two (2) residents were later found dead as a result of suicide. Sierra Tucson has had repeat and ongoing deficiencies with the services it provides in its acute psychiatric unit. Five (5) men, all of whom were patients at Sierra Tucson, have died since 2011. Three of them died from suicide, one died of drug toxicity, and the last man's body was discovered two (2) weeks after he had disappeared; the autopsy was inconclusive.

- In Texas, federal inspectors found dozen of incidents of violence, patient assaults, sexual misconduct, and numerous escapes at Acadia-owned Cedar Crest. Staffing levels were determined to be below standard. Staff members reported unsafe conditions and claimed that they have begged for help, because there is never enough staff even though the CEO of the hospital knows of these issues. This facility has also

been subject of a whistleblower lawsuit accusing it of billing Medicare, Tricare, and private institutions for phantom services and falsifying patient records for State audits.

- An investigation at Acadia Montana in 2016 found that within a 13-week period there were 128 patient assaults. Included in these incidents were staff handling patients aggressively, leaving them unsupervised, and watching pornography in front of them. The inspection noted that "staff reported the facility is understaffed."

- In Fayetteville, Arkansas, there are allegations that patients at Piney Ridge have been forced to fight with each other by members of the staff.

- In 2016, at Valley Behavioral, a female patient was violently raped by another male patient, both minors. The facility allowed male and female patients to be housed in the same hall and allowed many of the patients to go unsupervised. In addition, the facility was understaffed and therefore not able to provide sufficient supervision of the patients.

- A lawsuit was filed in 2017 against Longleaf Hospital, an Acadia owned facility, located in Louisiana. The complaint alleges that the plaintiff's son was assaulted by staff members and when she tried to remove her son after the assault, Longleaf Hospital would not release him. In addition, Longleaf Hospital attempted to obstruct and prevent law enforcement officers from investigating the assault.

- In 2016, in Pennsylvania, a patient at Belmont Behavioral Health Hospital was assaulted and sustained serious, and permanent, injuries. A lawsuit was filed alleging that the facility was understaffed, which resulted in patients being left unmonitored.

- Inspection reports from 2015 and 2016 indicate a number of deficiencies at Acadia's Delta Medical Center in Tennessee. The deficiencies include failing to give basic care

such as baths and wound treatment to senior citizens and failing to take proper precautions to prevent elderly patients from falling. In 2017 in Arkansas, a five-year old boy was killed at Ascent Children's Health Services when Ascent employees left him in a hot van for 8 hours. Ascent is owned by Acadia. Ascent was already on probation due to another boy was left unsupervised for hours and was found bloodied and bruised. The State of Arkansas later launched an investigation into incidents of alleged mistreatment of children.

- In 2017, in Las Vegas, Nevada, an elderly man admitted to Seven Hills was severely beaten up by several people who hit him in his ears and face, resulting in multiple bruises, a large knot behind his left ear, and his ear badly bruised, turning purple and black, and a large bruise on his left arm. In March of 2017, the elderly man was seriously beaten by a staff member of Seven Hills shoved him against a wall and pinned him there. Later that day, the elderly man was transported to a hospital and found to have suffered a brain bleed.

- In April 2017, in Las Vegas, Nevada, a young man with a history of self-harm was released from Harmony Health Care, despite known active psychosis, and self-amputated his right hand and stabbed himself in the right eye in the attempt to remove his eyeball due to his beliefs that he was possessed by demons and his actions would cast the demons out.

- In 2017, in Ada, Oklahoma, a husband filed a lawsuit on behalf of his wife against Acadia owned Rolling Hills Hospital for the failure of the hospital to protect her from the violence of another mentally ill patient. While waiting for medication, the plaintiff's wife was violently attacked from behind by a mentally ill patient who had not been segregated from the other patients. The plaintiff's wife was grabbed by her hair and

aggressively slammed into the concrete floor; she now suffers from permanent brain damage. There was no supervision or security present because of the understaffing problem. Another lawsuit, also in 2017, involving a minor, alleges that Rolling Hills Hospital knew of a danger and failed to exercise ordinary care to protect other patients from that harm. Included in the known danger was the fact that another patient had a long history of sexual assault and yet, Rolling Hills Hospital failed to protect the other children from harm. In addition, inspection reports, dating back to 2012, show a myriad of violations ranging from unqualified staff to patient rights to maintenance issues. Included in these reports are the instances where adolescent patients were restrained and secluded with no documentation of stated medical reasons or the duration of patients' seclusion; there were also times when patients were left unmonitored.

- In 2017, in Philadelphia, Pennsylvania to suicides occurred within a one-week period at Belmont Hospital. The lawsuit that was filed, alleged that the facility lacked sufficient and appropriately trained staff. Numerous inspection reports detail the lack of staff and the subpar training to prevent suicides at the facility.

- In 2017, in Fort Myers, Florida, at Park Royal Hospital, the facility's top physician resigned. He had been working at Park Royal since 2012 and cited the decline of the facility under Acadia. An inspection report from January 9, 2018, shows a number of deficiencies at the facility including many instances of violations of patients' rights.

- Harbor Oaks Hospital in New Baltimore, Michigan, an Acadia owned facility, has been accused of rampant patient and staff abuse. There have been reported patterns of abuse and allegations of both physical and sexual abuse of patients. Some staff members allegedly voiced their concerns to management about the understaffing

problem, but they said their concerns were repeatedly ignored and cited corporate profits as the reason why. It was not uncommon for there to be only five (5) staff members to care for 32 patients; sometimes that number dwindled to two (2) or three (3) staff leaving a more than 10 to one patient ratio.

- In Illinois, in 2018, plaintiff filed a lawsuit on behalf of the Estate of Grace Cho against Timberline Knolls Residential Treatment Center, an Acadia owned facility. The lawsuit alleges that Cho was admitted to Timberline Knolls psychiatric treatment. Despite knowing that Cho was on suicide watch, they allowed her to leave the premises. They failed to properly secure the premises and as a result, Cho sustained injuries that resulted in her death. In another lawsuit in August 2018, against Timberline Knolls, a counselor was charged with sexually assaulting a female patient during their therapy sessions. A lawsuit from 2015, also against Timberline Knolls, alleges that Timberline Knolls and its staff showed complete and utter indifference for the safety of its patients and failed to supervise, monitor, and protect plaintiff from the violence of other patients. In addition, the staff failed to intervene and stop the physical and verbal attacks on plaintiff by the other patient.

- In 2017, in Clark County, Nevada, a lawsuit was filed against Seven Hills Behavioral Health Hospital, an Acadia facility. The plaintiff was suffering from an anxiety attack and was admitted to Seven Hills Hospital for treatment. While there, she was in the presence of a male patient who invaded her personal space and made express, and inappropriate, romantic gestures to her. This male patient was given free rein and was allowed to continue to harass the plaintiff. The conduct was so obvious that other patients took notice and attempted to help plaintiff. Despite plaintiff's many complaints to staff they were all ignored, and her concerns were never investigated.

The male patient eventually got into plaintiff's room and exposed himself to her. Seven Hills Hospital had knowledge of the male patient's prior conduct and aggressive behavior and yet took no action to intervene even when plaintiff complained.

- In 2017, in Indiana, an investigation revealed that the staff at the Resource Residential Treatment facility not only allowed fights to happen among the patients, but even encouraged it for entertainment purposes. The investigation showed that between January and November of 2017, there was an average of more than 35 resident-on-resident assaults each month. In addition, there have been several incidents reported where staff members have been violent with the patients including sexual assaults.

- In May 2018 in Ohio, Jan Dye, a patient at the Ohio Hospital for Psychiatry, which is owned by Acadia, was severely mistreated after she was admitted for treatment of her bipolar disorder. Dye was recovering from a broken wrist she had sustained before being admitted. While in the Ohio Hospital, Dye was restrained on a bed, denied food and water, and was overmedicated. In addition, her wrist was rebroken, resulting in four more surgeries. In addition to Dye's story, there are other systemic issues at Ohio Hospital for Psychiatry that have been investigated and documented. The issues include violations of patient safety, care, and treatment standards.

98. Upon information and belief, the patterns and behaviors of misconduct at Rolling Hills when R.B. was raped follow the pattern of conduct in Acadia facilities. Upon information and belief, Rolling Hills had unqualified employees, was understaffed, failed to follow or enforce policies and procedures, and engaged in a pattern and practice of placing adolescent residents to merely fill beds. Upon information and belief, this conduct was the direct result of the corporate culture and business model of Acadia.

99. As a direct and proximate or legal result of Defendants' actions, R.B. has been injured.

100. R.B. also seeks treble damages, in an amount to be determined at the time of trial.

101. The actions of Defendants have forced R.B. to retain counsel to represent her in the prosecution of this action, and she is therefore in entitled to an award of a reasonable amount of attorneys' fees and costs.

## V. COUNT III
## Civil Conspiracy

102. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

103. Defendants combined together to accomplish the unlawful purpose of defrauding residents and their health insurers.

104. Acadia facilities have combined together to commit wrongful acts pursuant to the conspiracy, vis-à-vis Acadia entities, including Rolling Hills.

105. Specifically, upon information and belief, Acadia has committed fraud by making promises to ensure the safety of adolescent residents of Rolling Hills while intentionally understaffing facilities, and choosing not to provide adequate levels of staff, thereby endangering the safety of adolescent residents such as R.B..

106. Upon further information and belief, Acadia has committed fraud by falsely and/or fraudulently advertising the safety of residents and holding itself out as a residential treatment for treating adolescents despite providing inadequate levels of staffing and not providing for the safety of residents. Acadia has made these representations despite having knowledge of the multiple investigations, incidents of death, sexual assault, physical assault, and complaints of understaffing nationwide at Acadia facilities.

107. Specifically, upon information and belief, Jacobs and Acadia have committed fraud by making promises to provide adequate staffing levels and to ensure the safety of residents of Desert

Hills while intentionally understaffing facilities and choosing not to provide adequate levels of staff, thereby endangering the safety of residents such as R.B.

108. Defendants have committed fraud and misused funds by misusing residents' insurance proceeds and coverage, have billed for services not received, including paying for staff who allowed residents to be beaten, abused, sexually assaulted, and elope from facilities.

109. Defendants committed fraud and misused funds by misusing residents' insurance proceeds and coverage by charging for services, such as assessments for placement done by staff unfamiliar with the DSM IV manual and failing to take into account residents' histories and physicals.

110. Defendants have committed fraud and misused funds by repeatedly hired unqualified persons with criminal histories and employment histories that should have disqualified them from working in Acadia facilities.

111. Defendants have committed fraud and misused funds by repeatedly failed to report incidents and/or downgraded the incident level of incidents that have occurred in facilities to avoid reporting incidents to authorities, governmental agencies, and residents' own parents and guardians, to hide the incidents occurring in facilities and to avoid losing residents and their insurance proceeds.

112. Defendants have committed fraud and misused funds by billing for services never provided, failing to keep residents safe, and subjecting residents to violence and sexual attack.

113. Upon information and belief, numerous patients and residents, including children and teenagers, have died due to Acadia's negligence. There are numerous, recurring, reports of sexual and physical abuse at Acadia facilities, some of which is carried on by employees of Acadia:

- In 2007, in Arkansas, a five-year old boy was killed at Ascent Children's Health Services when Ascent employees left him in a hot van for 8 hours. Ascent is owned by Acadia. Ascent was already on probation due to another boy left unsupervised for hours and was found bloodied and bruised. The State of Arkansas later launched an investigation into incidents of alleged mistreatment of children.

- In Oklahoma, federal inspectors documented 64 separate violations at Rolling Hills Hospital since Acadia acquired it in 2012. Among the findings, inspectors determined that 26 deaths went unreported. Other complaints included assaults and rapes, and accusations that Acadia ordered its employees to remove security cameras and destroy video surveillance.

- In 2016, a lawsuit was filed against Valley Behavioral Health Systems and Acadia for the violent rape of a resident by another resident. Valley Behavioral Health allegedly placed a male patient with severe mental health issues in the same hall as female residents. The male patient grabbed a female patient, pulled her into a room, and violently raped her.

- In New Mexico, Acadia-owned Desert Hills has been the subject of numerous complaints. In 2016, a young resident was allowed to escape from Desert Hills during a trip to a hospital because Desert Hills did not provide the required number of employees to transport him. The young man was on the run for 3 days before being shot by a homeowner. Desert Hills has previous been the subject of numerous calls out to it by Albuquerque Police Department ("APD") for residents being on the roof of the facility. A sexually predacious resident was housed with a younger, more vulnerable resident and sexual abuse occurred. Another incident occurred where a

young resident was raped by a male staff member and Desert Hills' response was to cover up the rape and merely send the staff member home for one (1) day and did not notify the mother of the young resident until a visit with the mother a few days later. Desert Hills has two (2) Acadia employees – the CEO and COO. Acadia sets the budget for Desert Hills and that budget governs how much staff can be at the facility at any given time. In 2014, the APD began to prepare to declare Desert Hills a public nuisance because of the number of calls to the facility. Rather than fix these issues, Desert Hills met with CYFD and received a waiver so APD no longer had to be called for incidents at Desert Hills.

- In Pennsylvania, the Philadelphia Police Department has responded at least 600 times between 2011 and 2016 to incidents at Acadia-owned Bellmont Behavioral Hospital.

- In Florida, Acadia-owned Park Royal Hospital has had similar complaints. In 2018, authorities were investigating two (2) patient deaths and a sexual assault. A former employee was convicted of raping 11 patients several years ago, rapes that the hospital could have prevented had it not ignored warning signs. A 2017 inspection determined that Park Royal is understaffed and cannot properly supervise patients, ignored complaints, and had poor quality control procedures in place. In 2014, inspectors cited Park Royal's failure to perform 15-minute checks required to keep patients safe. That failure lead to death and rapes.

- In Phoenix, Arizona, inspectors declared an immediate jeopardy situation at Acadia-owned Sonora Behavioral Health Hospital. It found that the hospital had inadequate staffing and nursing practices and environmental issues all of which contributed to the death of a patient by suicide. This is in addition to the deaths of multiple young patients, after which inspectors determined that one Acadia staff person working in

*Gray v. Acadia Healthcare Company, Inc., et al.*
Complaint for Personal Injuries

the unit during these deaths was not qualified. Other investigations uncovered an assault on a vulnerable person that was not reported to the police or the parents, additional unqualified staff members, nurses drunk on the job, medication errors, improper use of physical restraints on patients, lack of patient supervision.

- In Tucson, Arizona, Acadia-owned Sierra Tucson has had several incidents as a result of violations of policies and procedures. For example, policies and procedures require staff to go to a resident's living quarters if the resident is more than 15-minutes late for a class. On several occasions, residents were late, and no one checked on them. Two (2) residents were later found dead as a result of suicide. Sierra Tucson has had repeat and ongoing deficiencies with the services it provides in its acute psychiatric unit. Five (5) men, all of whom were patients at Sierra Tucson, have died since 2011. Three of them died from suicide, one died of drug toxicity, and the last man's body was discovered two (2) weeks after he had disappeared; the autopsy was inconclusive.

- In Texas, federal inspectors found dozen of incidents of violence, patient assaults, sexual misconduct, and numerous escapes at Acadia-owned Cedar Crest. Staffing levels were determined to be below standard. Staff members reported unsafe conditions and claimed that they have begged for help, because there is never enough staff even though the CEO of the hospital knows of these issues. This facility has also been subject of a whistleblower lawsuit accusing it of billing Medicare, Tricare, and private institutions for phantom services and falsifying patient records for State audits.

- An investigation at Acadia Montana in 2016 found that within a 13-week period there were 128 patient assaults. Included in these incidents were staff handling patients aggressively, leaving them unsupervised, and watching pornography in front of them. The inspection noted that "staff reported the facility is understaffed."

- In Fayetteville, Arkansas, there are allegations that patients at Piney Ridge have been forced to fight with each other by members of the staff.

- In 2016, at Valley Behavioral, a female patient was violently raped by another male patient, both minors. The facility allowed male and female patients to be housed in the same hall and allowed many of the patients to go unsupervised. In addition, the facility was understaffed and therefore not able to provide sufficient supervision of the patients.

- A lawsuit was filed in 2017 against Longleaf Hospital, an Acadia owned facility, located in Louisiana. The complaint alleges that the plaintiff's son was assaulted by staff members and when she tried to remove her son after the assault, Longleaf Hospital would not release him. In addition, Longleaf Hospital attempted to obstruct and prevent law enforcement officers from investigating the assault.

- In 2016, in Pennsylvania, a patient at Belmont Behavioral Health Hospital was assaulted and sustained serious and permanent injuries. A lawsuit was filed alleging that the facility was understaffed, which resulted in patients being left unmonitored.

- Inspection reports from 2015 and 2016 indicate a number of deficiencies at Acadia's Delta Medical Center in Tennessee. The deficiencies include failing to give basic care such as baths and wound treatment to senior citizens and failing to take proper precautions to prevent elderly patients from falling. In 2017 in Arkansas, a five-year old boy was killed at Ascent Children's Health Services when Ascent employees left him in a hot van for 8 hours. Ascent is owned by Acadia. Ascent was already on probation due to another boy was left unsupervised for hours and was found bloodied

and bruised. The State of Arkansas later launched an investigation into incidents of alleged mistreatment of children.

- In 2017, in Las Vegas, Nevada, an elderly man admitted to Seven Hills was severely beaten up by several people who hit him in his ears and face, resulting in multiple bruises, a large knot behind his left ear, and his ear badly bruised, turning purple and black, and a large bruise on his left arm. In March of 2017, the elderly man was seriously beaten by a staff member of Seven Hills shoved him against a wall and pinned him there. Later that day, the elderly man was transported to a hospital and found to have suffered a brain bleed.

- In April 2017, in Las Vegas, Nevada, a young man with a history of self-harm was released from Harmony Health Care, despite known active psychosis, and self-amputated his right hand and stabbed himself in the right eye in the attempt to remove his eyeball due to his beliefs that he was possessed by demons and his actions would cast the demons out.

- In 2017, in Ada, Oklahoma, a husband filed a lawsuit on behalf of his wife against Acadia owned Rolling Hills Hospital for the failure of the hospital to protect her from the violence of another mentally ill patient. While waiting for medication, the plaintiff's wife was violently attacked from behind by a mentally ill patient who had not been segregated from the other patients. The plaintiff's wife was grabbed by her hair and aggressively slammed into the concrete floor; she now suffers from permanent brain damage. There was no supervision or security present because of the understaffing problem. Another lawsuit, also in 2017, involving a minor, alleges that Rolling Hills Hospital knew of a danger and failed to exercise ordinary care to protect other patients from that harm. Included in the known danger was the fact that another patient had a

long history of sexual assault and yet, Rolling Hills Hospital failed to protect the other children from harm. In addition, inspection reports, dating back to 2012, show a myriad of violations ranging from unqualified staff to patient rights to maintenance issues. Included in these reports are the instances where adolescent patients were restrained and secluded with no documentation of stated medical reasons or the duration of patients' seclusion; there were also times when patients were left unmonitored.

- In 2017, in Philadelphia, Pennsylvania to suicides occurred within a one-week period at Belmont Hospital. The lawsuit that was filed, alleged that the facility lacked sufficient and appropriately trained staff. Numerous inspection reports detail the lack of staff and the subpar training to prevent suicides at the facility.

- In 2017, in Fort Myers, Florida, at Park Royal Hospital, the facility's top physician resigned. He had been working at Park Royal since 2012 and cited the decline of the facility under Acadia. An inspection report from January 9, 2018, shows a number of deficiencies at the facility including many instances of violations of patients' rights.

- Harbor Oaks Hospital in New Baltimore, Michigan, an Acadia owned facility, has been accused of rampant patient and staff abuse. There have been reported patterns of abuse and allegations of both physical and sexual abuse of patients. Some staff members allegedly voiced their concerns to management about the understaffing problem, but they said their concerns were repeatedly ignored and cited corporate profits as the reason why. It was not uncommon for there to be only five (5) staff members to care for 32 patients; sometimes that number dwindled to two (2) or three (3) staff leaving a more than 10 to one patient ratio.

- In Illinois, in 2018, plaintiff filed a lawsuit on behalf of the Estate of Grace Cho against Timberline Knolls Residential Treatment Center, an Acadia owned facility. The lawsuit alleges that Cho was admitted to Timberline Knolls psychiatric treatment. Despite knowing that Cho was on suicide watch, they allowed her to leave the premises. They failed to properly secure the premises and as a result, Cho sustained injuries that resulted in her death. In another lawsuit in August 2018, against Timberline Knolls, a counselor was charged with sexually assaulting a female patient during their therapy sessions. A lawsuit from 2015, also against Timberline Knolls, alleges that Timberline Knolls and its staff showed complete and utter indifference for the safety of its patients and failed to supervise, monitor, and protect plaintiff from the violence of other patients. In addition, the staff failed to intervene and stop the physical and verbal attacks on plaintiff by the other patient.

- In 2017 in Clark County, Nevada, a lawsuit was filed against Seven Hills Behavioral Health Hospital, an Acadia facility. The plaintiff was suffering from an anxiety attack and was admitted to Seven Hills Hospital for treatment. While there, she was in the presence of a male patient who invaded her personal space and made express and inappropriate romantic gestures to her. This male patient was given free rein and was allowed to continue to harass the plaintiff. The conduct was so obvious that other patients took notice and attempted to help plaintiff. Despite plaintiff's many complaints to staff they were all ignored, and her concerns were never investigated. The male patient eventually got into plaintiff's room and exposed himself to her. Seven Hills Hospital had knowledge of the male patient's prior conduct and aggressive behavior and yet took no action to intervene even when plaintiff complained.

- In 2017, in Indiana, an investigation revealed that the staff at the Resource Residential Treatment facility not only allowed fights to happen among the patients, but even encouraged it for entertainment purposes. The investigation showed that between January and November of 2017, there was an average of more than 35 resident-on-resident assaults each month. In addition, there have been several incidents reported where staff members have been violent with the patients including sexual assaults.

- In May 2018, in Ohio, Jan Dye, a patient at the Ohio Hospital for Psychiatry, which is owned by Acadia, was severely mistreated after she was admitted for treatment of her bipolar disorder. Dye was recovering from a broken wrist she had sustained before being admitted. While in the Ohio Hospital, Dye was restrained on a bed, denied food and water, and was overmedicated. In addition, her wrist was rebroken, resulting in four more surgeries. In addition to Dye's story, there are other systemic issues at Ohio Hospital for Psychiatry that have been investigated and documented. The issues include violations of patient safety, care, and treatment standards.

114. Upon information and belief, the patterns and behaviors of misconduct at these facilities existed at Rolling Hills when R.B. was raped. Upon information and belief, Rolling Hills had unqualified employees, was understaffed, failed to follow or enforce policies and procedures, and engaged in a pattern and practice of merely placing children to fill beds. Upon information and belief, this conduct was the direct result of the corporate culture and business model of Acadia, which was created by Jacobs. This conduct was done in furtherance of the civil conspiracy between Jacobs and Acadia and its constituent members and effectuated through Acadia entities, such as Rolling Hills.

115. As a direct and proximate or legal result of Defendants' civil conspiracy, R.B. has been injured.

116. The totality of circumstances underlying this matter allows reasonable inference of a civil conspiracy.

117. As a result of the civil conspiracy, Defendants are jointly and severally liable for the torts of any member of the conspiracy.

118. Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of R.B., resulting in injuries and harm to R.B., justifying an award of punitive damages.

119. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of R.B..

## VI. COUNT IV
## Negligence

**Negligence**

120. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

121. Defendants owed a duty to exercise ordinary care and act as a reasonable and prudent company would under the same or similar circumstances, including, but not limited to, ensuring the safety of R.B.. Defendants breached that duty and were negligent. Defendants'

negligence was the sole proximate cause and/or a proximate cause of R.B.'s injuries. Defendants' negligence includes, but is not limited to, the following:

- Failing to secure R.B. in a safe environment;

- Failing to reasonably exercise custodial control over R.B.;

- Failing to reasonably exercise *in loco parentis* powers over R.B.;

- In negligently hiring, supervising, and/or retaining control of employees who manage, direct, and/or control operations on behalf of Defendants;

- In failing to exercise their authority to control the manner in which work was performed to adequately train their employees and/or agents to keep safe custody of R.B.;

- In failing to have appropriate policies and procedures, or, in the alternative, failing to enforce their policies and procedures;

- In other respects to be found during the course of discovery.

122. Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of R.B., resulting in injuries and harm to R.B., justifying an award of punitive damages.

123. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of R.B..

**Respondeat Superior**

124. Defendants are vicariously liable for the damages proximately caused to R.B. by virtue of the negligent conduct of their employees. At the time of the incidents underlying this matter, Defendants had employees who were acting within the course and scope of their employment with Defendants and were negligent. The negligence of these employees was a proximate cause of R.B.'s injuries and harm. Therefore, Defendants are vicariously liable to R.B. for the negligent acts and/or omissions for their employees on the basis of respondeat superior.

125. The agents and employees of Defendants, including, but not limited to Jason H., had, and exercised, significant authority and control over R.B.

126. Defendants conferred the authority over children at its facility, including R.B., upon its agents and employees as part of their agency.

127. Defendants' employees, including Jason H., were aided by their agency with Defendants in the commission of the harms and injuries perpetrated against R.B.

128. Defendants are vicariously liable for any and all wrongful acts and conduct of Jason H. for the injuries he caused R.B..

129. Furthermore, Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

130. Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of R.B., and other persons, resulting in the harm and injuries suffered by R.B..

131. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principles. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

## Negligent Selection, Retention, and/or Supervision

132. Defendants are subject to liability for harm to persons, such as R.B., for Defendants' failure to exercise reasonable care to employ competent and careful employees and/or agents. Defendants breached their duty to select, retain, and/or supervise such employees and/or agents and were negligent in their selection of employees and/or agents to work at Defendants' facility – Rolling Hills. Defendants' negligence was the sole proximate cause and/or a proximate cause of R.B.'s injuries and harm. Defendants' negligence includes, but is not limited to:

- Failing to select employees and/or agents who could skillfully and carefully perform work involving risk of harm to juveniles;

- Failing to select employees and/or agents who could properly perform any duty, which an employer owes to third persons;

- Failing to ensure that employees and/or agents were properly trained;

- Failing to supervise such employees and/or agents.

133. During the time of R.B.'s residential treatment in Rolling Hills, Defendants became aware, or should have become aware, of problems and/or conduct that indicated unfitness of such employees and/or agents. Defendants failed to take further action to investigate, discharge, and/or reassign such employee and/or agents and R.B.'s damages were caused by Defendants' negligent hiring, retention, and/or supervision of such employees and/or agents.

134. Defendants had a duty to select employees/agents that performed work with due diligence, in a good manner, using competent and experienced employees/agents in accordance with recognized industry practices, and that would comply with all applicable rules and regulations and standards of Defendants concerning safety, security, and well-being of persons and property. Defendants breached this duty in selecting employees/agents that were unfit.

135. Defendants retained employees/agents who were incompetent and failed to conduct work in accordance with industry practices and that would comply with all applicable rules and regulations and standards of Defendants concerning safety, security, and well-being of persons and/or property.

136. Defendants knew, or should have known, that the employees/agents were incompetent and failed to work in accordance with industry practices, and that they would not comply with all applicable rules and regulations and standards of Defendants concerning safety, security, and well-being of persons and/or property. Additionally, Defendants failed to supervise the conduct and/or work being performed by employees/agents who were incompetent and failed to conduct work in accordance with recognized industry practice.

137. Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of R.B., resulting in injuries and harm to R.B., justifying an award of punitive damages.

138. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from

the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of R.B..

139. Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/o principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for it with regard to the conduct at issue, independent of higher authority.

140. Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of R.B., and other persons, resulting in the harm and injuries suffered by R.B..

141. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principles. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

### Violation of Statute/Negligence Per *Se*

142. Defendants violated the Children's Mental Health and Developmental Disabilities Act, N.M.S.A. 1978, Sections 32A-6A-2 through 32A-6A-30, in that they failed to provide appropriate services and treatment to R.B. failed to provide a continuum of services to address to R.B.'s habilitation and treatment needs, failed to provide R.B. with access to services to identify, prevent, and intervene for R.B.'s mental health needs, and failed to protect the substantive and procedural rights of R.B., regardless of setting. This section proscribes certain

actions and/or creates a standard of conduct and Defendants' conduct represents an unexcused violation of this standard. R.B. belongs to the class of persons that this Act was meant to protect and his harm or injury is generally of the type this ordinance/section/statute is seeks to prevent. The Children's Mental Health and Developmental Disabilities Act, N.M.S.A. 1978, Sections 32A-6A-2 through 32A-6A-30, was enacted for the safety and well-being of the public, generally, and R.B., specifically.

143. Defendants violated the Children's Mental Health and Developmental Disabilities Act, N.M.S.A. 1978, Section 32A-6A-12, in that they failed to provide R.B. with a safe, clean, and comfortable environment. This section proscribes certain actions and/or creates a standard of conduct and Defendants' conduct represents an unexcused violation of this standard. R.B. belongs to the class of persons that this Act was meant to protect and his harm or injury is generally of the type this ordinance/section/statute is seeks to prevent. The Children's Mental Health and Developmental Disabilities Act, N.M.S.A. 1978, Section 32A-6A-12 was enacted for the safety and well-being of the public, generally, and R.B., specifically.

144. Defendants violated the Children's Mental Health and Developmental Disabilities Act, N.M.S.A. 1978, Section 32A-6A-17, in that they failed to fulfill their obligations as an appointed guardian on behalf of R.B., including, but not limited to, failing to make decisions on behalf of R.B. in their best judgment of the treatment appearing to be in the best interests of R.B. and consistent with the least restrictive means principle for accomplishing the objective, failed to consult with R.B. regarding previous decisions made by R.B. in similar circumstances when R.B. was able to make decisions and Defendants failed to make decisions in accordance with known values of R.B. or best interests of R.B.. This section proscribes certain actions and/or creates a standard of conduct and Defendants' conduct represents an unexcused violation of this standard. R.B. belongs to the class of persons that this Act was

meant to protect and R.B.'s harm or injury is generally of the type this ordinance/section/statute is seeks to prevent. The Children's Mental Health and Developmental Disabilities Act, N.M.S.A. 1978, Section 32A-6A-17 was enacted for the safety and well-being of the public, generally, and R.B., specifically.

145. Defendants violated the Children's Mental Health and Developmental Disabilities Act, N.M.S.A. 1978, Section 32A-6A-18 in that they failed to take into account individual instructions. This section proscribes certain actions and/or creates a standard of conduct and Defendants' conduct represents an unexcused violation of this standard. R.B. belongs to the class of persons that this Act was meant to protect and R.B.'s harm or injury is generally of the type this ordinance/section/statute is seeks to prevent. The Children's Mental Health and Developmental Disabilities Act, N.M.S.A. 1978, Section 32A-6A-18 was enacted for the safety and well-being of the public, generally, and R.B., specifically.

146. Nothing in the Children's Mental Health and Developmental Disabilities Act shall be construed to relieve any professional or facility from liability for negligence and/or intentional misconduct in the diagnosis, treatment, and/or services provided to any child pursuant to N.M.S.A. 1978, Section 32A-6A-23.

147. Defendants violated the Residential Treatment Program Act, N.M.S.A. 1978, Sections 32A-12-1 through 32A-12-2, and regulations promulgated pursuant to that Act, Sections 7.20.1.1 through 7.20.11.7, 7.20.11.16, 7.20.11.30, and 7.20.12.35(E) and (I), in that they failed to fulfill minimum standards proscribed to be met by residential treatment programs, including protecting R.B. from attack. This section proscribes certain actions and/or creates a standard of conduct and Defendants' conduct represents an unexcused violation of this standard. R.B. belongs to the class of persons that this Act was meant to protect and his harm or injury is generally of the type this ordinance/section/statute is seeks to prevent. The N.M.S.A. 1978,

Sections 32A-12-1 through 32A-12-2, and regulations promulgated pursuant to that Act, Sections 7.20.1.1 through 7.20.11.7, 7.20.11.16, 7.20.11.30, and 70.20.12.35(E) were enacted for the safety and well-being of the public, generally, and R.B., specifically.

148. As a direct and proximate result of Defendants' negligence per se, R.B. incurred damages, resulting in an amount of damages to be proven at trial.

149. Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of R.B., resulting in injuries and harm to R.B., justifying an award of punitive damages.

150. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by their employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of R.B..

151. Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

152. Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of R.B., and other persons, resulting in the harm and injuries suffered by R.B..

153. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principles. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

**Liability for Nondelegable Duty**

154. Due to the nature of the relationship and obligations entered into by Defendants as a result of the contracts involved in this case, including, but not limited to, Rolling Hills' role as custodian for R.B., Defendants had a nondelegable duty for which they cannot escape liability.

155. The duties created by the relationship between Defendants and R.B. were nondelegable.

156. As a result of the nondelegable nature of Defendants' duties in this case, they are jointly and severally liable for damages caused to R.B.. To the extent Defendants seeks to hold any other entity liable for R.B.'s damages and injuries, Defendants are jointly and severally liable for both the liability of those entities and of any other persons or entities to which their nondelegable duties apply.

### VII. COUNT V
### Professional Liability

157. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

158. In the operation of Rolling Hills, and in the care of residents like R.B., Defendants owed a professional duty to provide appropriate supervisions of residents in a residential treatment facility.

159. Defendants owed a professional duty to engage in sufficient background investigation and inquiry so as to develop an understanding of the risks and dangers presented for each resident within their facility, including R.B..

160. Defendants knew, or should have known, that it was foreseeable that adolescents in residential treatment facilities, without adequate supervision, would be vulnerable to predation by facility staff.

161. Defendants knew, or should have known, that it was foreseeable that R.B., without adequate supervision, would be in danger from other predatory staff.

162. Defendants breached their professional duty by failing to take adequate steps to protect R.B. when:

- It failed to provide adequate supervision over R.B.;

- It failed to keep R.B. safe;

- It failed to provide proper training to staff;

- It allowed R.B. to be attacked without adequate supervision;

- It knew, or should have known, that R.B. would be at risk and did not take appropriate steps to supervise and protect R.B..

163. As a direct and proximate cause of Defendants' actions and/or omissions, R.B. suffered physical bodily injury and damages.

164. Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter

indifference to, harmful consequences, including the health and safety of R.B., resulting in injuries and harm to R.B., justifying an award of punitive damages.

165. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by their employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of R.B..

166. Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

167. Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of R.B., and other persons, resulting in the harm and injuries suffered by R.B..

168. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principles. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

## VIII. COUNT VI
## Breach of Fiduciary Duty

169. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

170. At all times material to the allegations set forth in this lawsuit, Defendants knew R.B. was vulnerable to injury and in need of residential treatment services.

171. Defendants knew that R.B. would suffer injury and harm if she was not properly supervised and protected.

172. Defendants assumed duties as R.B.'s fiduciary, caretaker, and custodian when Defendant Rolling Hills became R.B.'s appointed custodian.

173. Defendants assumed duties as R.B.'s fiduciary, caretaker, and custodian when Defendants chose to admit R.B. to the Rolling Hills facility.

174. Defendants breached their fiduciary duty to R.B..

175. As a direct and proximate result of Defendants' breach of duty R.B. suffered physical bodily injury, mental injury, and damages.

176. Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of R.B., resulting in injuries and harm to R.B., justifying an award of punitive damages.

177. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by their employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from

the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of R.B..

178. Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

179. Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of R.B., and other persons, resulting in the harm and injuries suffered by R.B..

180. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principles. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

## IX. COUNT VII
### Breach of Contract Third-Party Beneficiary Claims

181. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

182. Defendant Rolling Hills entered into a contract to be R.B.'s residential treatment program.

183. In reliance upon Rolling Hills' representation of services that would be provided, R.B. was placed at Rolling Hills.

184. Upon information and belief, the Agreement regarding Rolling Hills' obligations to R.B. are set forth in the Rolling Hills' intake and admissions assessment, Rolling Hills' online website, and other documents and records related to R.B.'s status as a CYFD ward.

185. Rolling Hills promised that R.B.'s emotional and behavioral needs would be addressed by residential treatment care.

186. Rolling Hills promised to provide R.B. with a safe and therapeutic residential treatment care environment.

187. Such promises imposed duties, obligations, and responsibilities on Defendants regarding the safe, appropriate, and therapeutic environment provided for R.B.. Such promises created a contract among Rolling Hills and CYFD, of which R.B. was the third-party beneficiary.

188. Defendants Rolling Hills and Acadia charged money for the services they promised, and bargained for, as stated in this lawsuit.

189. Defendants breached Rolling Hills' promises and their contractual duties.

190. The parties to the contract described herein intended, and specifically contemplated, R.B. would be the beneficiary to the contract.

191. As a direct and proximate result of Defendants' breach of this contract, R.B. suffered injuries and damages.

192. Defendants are liable to R.B. for all amounts paid under the contract and all consequential damages allowed under New Mexico law, including breach of the covenant of good faith and fair dealing.

193. The nature of the contract entered into by Rolling Hills was such that emotional injuries were foreseeable as a result of Defendants' breach of the contract.

194. Defendants are liable to R.B. for all physical and emotional injuries and damages suffered as a result of the breach of contract.

195. Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of R.B., resulting in injuries and harm to R.B., justifying an award of punitive damages.

196. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of R.B..

197. Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

198. Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of R.B., and other persons, resulting in the harm and injuries suffered by R.B..

199. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principles. Therefore, Defendants are vicariously liable for punitive damages

based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

## X. COUNT VIII
## Breach of Covenant of Good Faith and Fair Dealing Third-Party Beneficiary Claims

200. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

201. There is in every contract, including the one described above, a covenant of good faith and fair dealing.

202. Defendants have breached that covenant, without privilege or cause to do so.

203. As a result of Defendants' breach, R.B. suffered damages in an amount to be shown at trial.

204. Further, Defendants' acts and/or omissions described herein were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of R.B., resulting in injuries and harm to R.B., justifying an award of punitive damages.

205. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of R.B..

206. Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for it with regard to the conduct at issue, independent of higher authority.

207. Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of R.B., and other persons, resulting in the harm and injuries suffered by R.B..

208. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principles. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

## XI. COUNT IX
### Unfair Practices Act ("UPA") Claims

209. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

210. Defendants have violated the New Mexico Unfair Practices Act, N.M.S.A. 1978, Sections 57-12-1, *et seq.*

211. Specifically, Defendants are a "person" as defined by Section 57-12-2(A) and has engaged in "trade or commerce" by "offering for sale or distribution . . . services . . . ." as defined in Section 57-12-2(C).

212. Defendants has made representations on their online website regarding their services.

213. Such statements include, but are not limited to, that Rolling Hills claims its mission is to "provide superior behavioral healthcare services" with "Core Values" of "Integrity – honesty and fairness", "Respect – treat people as we wish to be treated", and "Excellence – providing the level of care we would want for a family member".

214. Rolling Hills "is proud to offer adolescent behavioral health services that are designed to stabilize young people who are battling emotional and behavioral concerns." It claims that its therapies and "treatment modalities" "allow young people to leave [its] hospital and become functioning, successful members of the community."

215. Rolling Hills claims its therapies are "designed to meet the needs of youth between the ages of 12 and 18 who are suffering from mental, behavioral, and/or emotional concerns."

216. It contends its program "specializes in the diagnosis and treatment of psychiatric conditions by providing a comprehensive range of services as part of [its] short-term stabilization treatment model".

217. Rolling Hills holds itself out as possessing a "caring and compassionate staff".

218. Rolling Hills promises "[b]y implementing individualized service plans that are tailored to address the unique concerns of each patient who is entrusted in our care, the staff at Rolling Hills Hospital in Ada, OK is able to help adolescents stabilize and develop the tools needed to maintain the highest level of functioning, all while remaining in a safe and healing environment that is conducive to healing."

219. In providing such services to R.B., Defendants engaged in unfair or deceptive trade practices as defined by Section 57-12-2(D) by knowingly making false or misleading oral or written statements in connection with the sale of services, which did tend to, or did, deceive and mislead R.B..

220. The conduct of Defendants

- used exaggeration, innuendo, or ambiguity as to a material fact or failed to state a material fact if doing so deceives or tends to deceive; or

- failing to deliver the services contracted for.

221. Further, Defendants engaged in unconscionable trade practices, as that term is defined in Section 57-12-2(E), because it took advantage of the lack of knowledge, ability, experience, and capacity of R.B. to an unfair degree, rendering Defendants' acts unconscionable trade practices.

222. As a direct and proximate result of Defendants' unfair, deceptive, and unconscionable trade practices as described above, Rolling Hills was selected as the residential treatment program for R.B..

223. Under Section 57-12-10, R.B. is entitled to an award up to three (3) times the actual damages, should they so elect, as opposed to punitive damages under this count, which are also available under the facts and circumstances. R.B. is also entitled to an award of reasonable attorney's fees in connection with prosecution of the UPA claims.

224. The UPA violations were malicious, willful, reckless, and/or wanton, displaying a conscious, deliberate, and/or reckless disregard of, or utter indifference to, harmful consequences, including the health and safety of R.B., resulting in injuries and harm to R.B., justifying an award of punitive damages.

225. R.B. may elect punitive damages in lieu of treble damages under the UPA.

226. A corporation may be held liable for punitive damages for a culpable mens rea demonstrated by the actions and/or omissions by its employees, when viewed in the aggregate. The actions and/or omissions of Defendants' employees and/or agents viewed in the aggregate determine that Defendants had the requisite culpable mental state because of the cumulative conduct of their employees and/or agents. The culpable mental state of Defendants may be viewed from

the very fact that one employee and/or agent could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. The totality of the circumstances indicates Defendants' wanton and/or reckless disregard for the lives, safety and/or property of other persons, including the life, safety, health, and well-being of R.B..

227. Defendants are vicariously liable for punitive damages based on the conduct of their employees, officers, and/or principals. Defendants' employees, officers, and/or principals were acting in the course and scope of their employment with Defendants and had sufficient discretionary authority to speak for them with regard to the conduct at issue, independent of higher authority.

228. Defendants' acts and omissions described herein were malicious, willful, reckless, or wanton, displaying a conscious, deliberate or reckless disregard of, or utter indifference to, harmful consequences, including the health, safety, and well-being of R.B., and other persons, resulting in the harm and injuries suffered by R.B..

229. Defendants authorized, participated in, and/or ratified the conduct of their employees, officers, and/or principles. Therefore, Defendants are vicariously liable for punitive damages based on their authorization, participation, and/or ratification of the conduct of their employees, officers, and/or principals.

## XII. DAMAGES

230. The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

231. As a direct and proximate result of Defendants' conduct, R.B. suffered compensatory damages, including, but not limited to: medical and psychological bills; emotional pain and suffering; physical pain and suffering; loss of enjoyment of life; lost future earning capacity, economic damages, all of which will continue in the future. Additionally, Plaintiff is entitled

to recover punitive damages in such amounts allowed by law and as determined by the factfinders in this case, as well as any other damages or relief available under New Mexico law as determined appropriate by the Court.

## XIII. JURY DEMAND

232. Plaintiff hereby requests and demands a trial by jury on all issues properly submitted to a jury.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for a judgment against Defendants for damages sufficient to fully compensate R.B. for all the injuries and damages described herein, punitive damages, for pre- and post-judgment interest as allowed by law, for costs and for such other and further relief as the Court deems just and proper in law and in equity.

Respectfully submitted,

FADDUOL, CLUFF, HARDY & CONAWAY, P.C.

*/s/ Joshua K. Conaway*
Joshua K. Conaway
3301 San Mateo Boulevard NE
Albuquerque, New Mexico 87107
Telephone: 505.243.6045
Fax: 505.243.6642
jconaway@fchclaw.com

and

F. Michael Hart
Kelly Stout Sanchez
MARTINEZ, HART, THOMPSON & SANCHEZ, P.C.
1801 Rio Grande Boulevard NE
Albuquerque, New Mexico 87104
Telephone: 505.343.1776
Fax: 505.343.7709
mikeh@osolawfirm.com
kellys@osolawfirm.com

*ATTORNEYS FOR PLAINTIFF*