IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **REBECAH BANUELOS,** <br><br> **Plaintiff,** <br><br> v. <br><br> **ACADIA HEALTHCARE COMPANY, INC., and ROLLING HILLS HOSPITAL, LLC,** <br><br> **Defendants.** | Case No. 19-CV-338-JFH |

## OPINION AND ORDER

This matter comes before the Court on the Motions for Summary Judgment of Defendants Rolling Hills Hospital, LLC ("Rolling Hills") [Dkt. No. 188], and Acadia Healthcare Company, Inc. ("Acadia") [Dkt. No. 189]. For the reasons set forth below, the Court grants in part and denies in part the motion of Rolling Hills and grants the motion of Acadia.

## BACKGROUND

This case arises from two alleged incidents in which Plaintiff Rebecah Banuelos ("Ms. Banuelos") was sexually assaulted at the Rolling Hills Hospital Residential Treatment Center. Ms. Banuelos asserts five causes of action: (1) negligence; (2) negligent hiring, retention, and supervision; (3) negligence *per se*; (4) breach of fiduciary duty; and (5) alter ego. Rolling Hills has moved for summary judgment on the substantive causes of action. Acadia has also moved for summary judgment, arguing Rolling Hills is not its alter ego.

## STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." A fact is genuinely disputed "when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). When the Court applies this standard, it "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). If the movant carries this initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671. If the evidence is such that a reasonable jury could return a verdict for the nonmovant, summary judgment is improper. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). While the non-movant "need not produce evidence in a form that would be admissible at trial, the content or substance of the evidence must be admissible." *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998). For example, "[h]earsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment." *Jaramillo v. Colorado Jud. Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005).[1]

---

[1] Ms. Banuelos purports to dispute certain facts based on hearsay statements (and sometimes hearsay within hearsay statements) contained in Oklahoma Department of Human Services documents and an "investigative narrative" from the Ada Police Department. The Court does not consider such hearsay statements when determining the undisputed material facts.

**UNDISPUTED MATERIAL FACTS**

**A. Rolling Hills.**

The material facts which follow are not disputed by Ms. Banuelos and Rolling Hills. In January of 2018, Ms. Banuelos was placed into the custody of the New Mexico Children, Youth, and Families Department ("CYFD") and entered the foster care system. In September of 2018, she was arrested. Then in December of 2018, while in the custody of CYFD and the Bernalillo County Juvenile Detention Center, Ms. Banuelos was admitted to the Rolling Hills Hospital Residential Treatment Center. Prior to arriving at Rolling Hills, she was a victim of human sex trafficking.

On January 8, 2019, Ms. Banuelos, a minor at the time, informed a Rolling Hills staff member that Jason Calicutt ("Mr. Calicutt"), another Rolling Hills staff member, had engaged in sexual acts with her while in a laundry room. On January 12, 2019, Ms. Banuelos informed a Rolling Hills staff member that Dennis Aguirre Saavedra (also known as "Sophia"), another Rolling Hills resident, had touched her breast while the two were watching television in a common room. Then on March 18, 2018, Ms. Banuelos was discharged from Rolling Hills and returned to the Bernalillo County Juvenile Detention Center. As a result of the sexual assaults, she suffers from post-traumatic-stress disorder and depression.

Pursuant to Rolling Hills' "Special Precautions Policy," an admitted resident shall be assessed to determine whether he or she has a history of or potential for high-risk behaviors, and if so, whether special monitoring precautions should be utilized. The resident is evaluated to determine whether he or she has "sexually acted out" as an aggressor or been the victim of a sexual act (an "SAO victim"). Rolling Hills has an additional policy regarding "Sexual Aggression and Sexual Victimization: Early Identification, Observation, Intervention, Response, and Notification Plan," which directs staff to monitor the resident at issue and implement necessary interventions.

3

A resident who exhibits even a single sexual risk factor, such as a history of sexual abuse, is to be placed on specific precautions, such as being under constant, one-to-one supervision. Upon intake, Ms. Banuelos was not given SAO victim status and was instead designated with a "very low" overall risk level: a nine on a scale of zero to sixty-eight.

Mr. Calicutt was hired by Rolling Hills in July of 2017. As a part of this hiring process, he provided fingerprints and authorized Rolling Hills to obtain information regarding his background and suitability for employment. Rolling Hills engaged an independent third-party to conduct a universal background screening, searched public court records, verified Mr. Calicutt's status with the Oklahoma State Nurse Aide Registry, obtained a drug screen, and contacted three references. The Oklahoma Department of Human Services additionally conducted a review of Mr. Calicutt and reported to Rolling Hills that Oklahoma State Bureau of Investigation and Federal Bureau of Investigation records show that Mr. Calicutt had no prior arrests, had no criminal history prohibitions, had no criminal history restrictions, and was not registered with the Child Care Restricted Registry. The background check showed that Mr. Calicutt had no criminal or sex offender history. The Oklahoma Department of Human Services cleared Mr. Calicutt for hiring.

After being hired, Mr. Calicutt completed 38.5 hours of employee orientation and training, which included training regarding appropriate boundaries with residents and not engaging in relationships or sexual activities with residents. Rolling Hills has a strict "zero tolerance" policy regarding inappropriate relationships with patients, and Mr. Calicutt was instructed that any sexual activity with any resident is forbidden. Prior to the incident reported by Ms. Banuelos on January 8, 2019, Rolling Hills had not received any information or report that Mr. Calicutt had engaged in any inappropriate sexual relationship or activity with any resident.

B. Acadia.

The material facts which follow are not disputed by Ms. Banuelos and Acadia.[2] Acadia is a publicly owned corporation organized under the laws of the State of Delaware with its principal place of business in Franklin, Tennessee. Rolling Hills is a limited liability company organized under the laws of the State of Oklahoma. Acadia owns 100% of the limited liability company interests in Rolling Hills, and the two entities have some corporate officers in common. The CEO and CFO of Rolling Hills are not officers of Acadia, and are employed by Acadia Management Company, LLC, a separate, wholly owned subsidiary of Acadia. All other Rolling Hills employees are employed by Rolling Hills. The Rolling Hills CEO and CFO have authority to control and manage the Rolling Hills facility.

Rolling Hills maintains its own books and records separate and distinct from those of Acadia, and the two entities observe separate legal and accounting formalities. Rolling Hills' business is not primarily with Acadia, and no assets owned by Rolling Hills have been conveyed to Acadia. Rolling Hills is profitable, and Acadia generally does not provide it financing for expenses or non-routine capital items. Rolling Hills is adequately capitalized, and Acadia does not fund its salaries or operating expenses. It is Rolling Hills, and not Acadia, which holds the license to operate the Residential Child Care Facility at issue. If Rolling Hills performs an internal investigation regarding a sexual assault incident, it is not permitted to share its findings to a third-party without express authorization from Acadia. Rolling Hills' risk management policies,

---

[2] Ms. Banuelos purports to dispute certain facts and assert certain undisputed facts based on deposition testimony given in several unrelated cases her counsel has filed against Acadia. These cases involve different allegations occurring at non-party facilities and do not involve Rolling Hills. The Court declines to consider this deposition testimony for purposes of summary judgment. *See Thelma Jean Lambert Living Tr. v. Chevron U.S.A., Inc.*, 2016 WL 6610898, at *5 (D. Kan. Nov. 9, 2016) ("The Court agrees that deposition testimony taken in a different case with different parties is inadmissible and should not be considered on summary judgment.").

practices, and procedures are provided by Acadia. And if Rolling Hills is sued, Acadia choses which legal counsel will provide the defense.

### C. Disputed material fact.

Acadia claims it does not refer to Rolling Hills as a division or department. Ms. Banuelos, conversely, claims Acadia operates Rolling Hills in part through its Governing Board, which includes a "Division President" and "Division Clinical Director." The CEO of Rolling Hills reports directly to the Division President.

## DISCUSSION

The Court first considers the motion for summary judgment of Rolling Hills before turning to the motion of Acadia.

### I.   Rolling Hills.

Rolling Hills has moved for summary judgment on the four substantive causes of action: (1) negligence; (2) negligent hiring, supervision, and retention; (3) negligence *per se*; and (4) breach of fiduciary duty.

#### A. Negligence.

Ms. Banuelos alleges Rolling Hills failed to exercise ordinary care in the course of her treatment and was, therefore, negligent. Specifically, she claims Rolling Hills failed to secure her in a safe environment and failed to enforce proper policies and procedures regarding her care. Under Oklahoma law, "[t]here are three elements to a claim for negligence: (1) a duty owed by the defendant to protect the plaintiff from injury; (2) a failure to perform that duty; and (3) injuries to the plaintiff which are proximately caused by the defendant's failure to exercise the duty of care." *Smith v. City of Stillwater*, 2014 OK 42, ¶ 22, 328 P.3d 1192, 1200. Rolling Hills focuses on the second element, asserting it did not breach any duty owed to Ms. Banuelos.

Summary judgment on the negligence claim, however, is not warranted because the evidence is such that a reasonable jury could return a verdict for Ms. Banuelos. Prior to arriving at Rolling Hills, she was a victim of human sex trafficking. And pursuant to Rolling Hills' "Special Precautions Policy" and "Sexual Aggression and Sexual Victimization: Early Identification, Observation, Intervention, Response, and Notification Plan," Ms. Banuelos should have been assessed to determine whether she had a history of or potential for high-risk behaviors, and if so, whether special monitoring precautions should be utilized. Pursuant to these policies, because Ms. Banuelos exhibited a sexual risk factor (her history of sexual abuse) she should have been placed on specific precautions. Instead, Ms. Banuelos was *not* given "SAO victim" status and was designated with a "very low" overall risk level: a nine on a scale of zero to sixty-eight. A reasonable jury could conclude that Ms. Banuelos should have been given SAO victim status and placed on constant observation. Because she was not placed on constant observation, so the argument might go, she was able to be alone with Mr. Calicutt in a laundry room and unsupervised with Sophia, which precipitated the sexual assaults.

Rolling Hills additionally argues that even if it may have been negligent, the sexual assault Mr. Calicutt committed was a supervening cause of harm which precludes the imposition of liability. It is true that in certain scenarios, a supervening cause cuts off the liability of the original actor. *Franks v. Union City Pub. Sch.*, 1997 OK 105, ¶ 9, 943 P.2d 611, 614. Liability is limited where the supervening cause was: (1) independent of the original act of negligence; (2) adequate in and of itself to bring about the result; and (3) not reasonably foreseeable. *Id*. A reasonable jury, however, could conclude that the sexual assault was reasonably foreseeable due to Ms. Banuelos' history of sexual abuse and the failure to designate her as a SAO victim. Rolling Hills' motion for summary judgment on the general negligence claim is consequently denied.

### B. Negligent hiring, supervision, and retention.

Ms. Banuelos additionally alleges Rolling Hills was negligent in its hiring, supervision, and retention of Mr. Calicutt. In Oklahoma, "[e]mployers may be held liable for negligence in hiring, supervising or retaining an employee . . . . An employer is found liable, if—at the critical time of the tortious incident—, the employer had reason to believe that the person would create an undue risk of harm to others." *N.H. v. Presbyterian Church (U.S.A.)*, 1999 OK 88, ¶ 20, 998 P.2d 592, 600. An employer's notice of the employee's predisposition to cause the complained of harm is central to this inquiry: "[t]he critical element for recovery is the employer's prior knowledge of the servant's propensities to create the specific danger resulting in damage." *Id.*, at ¶ 21.

The undisputed material facts establish Rolling Hills was not negligent in hiring, supervising or retaining Mr. Calicutt. As a part of the hiring process, Mr. Calicutt provided fingerprints and authorized Rolling Hills to obtain information regarding his background and suitability for employment. Rolling Hills engaged an independent third-party to conduct a universal background screening, searched public court records, verified Mr. Calicutt's status with the Oklahoma State Nurse Aide Registry, obtained a drug screen, and contacted three references. The Oklahoma Department of Human Services additionally conducted a review of Mr. Calicutt and reported to Rolling Hills that Oklahoma State Bureau of Investigation and Federal Bureau of Investigation records show that Mr. Calicutt had no prior arrests, had no criminal history prohibitions, had no criminal history restrictions, and was not registered with the Child Care Restricted Registry. The background check showed that Mr. Calicutt had no criminal or sex offender history. The Oklahoma Department of Human Services cleared Mr. Calicutt for hiring. Consequently, there is no evidence that Rolling Hills had any prior knowledge of Mr. Calicutt's propensity to sexually assault a resident at the time of hiring. It had no notice of any improper

behavior and therefore had no had reason to believe Mr. Calicutt would create an undue risk of harm to any resident. Rolling Hills, therefore, was not negligent in hiring Mr. Calicutt.

Similarly, Rolling Hills was not negligent in supervising or retaining Mr. Calicutt. After being hired, Mr. Calicutt completed 38.5 hours of employee orientation and training, which included training regarding appropriate boundaries with residents and not engaging in relationships or sexual activities with residents. Rolling Hills has a strict "zero tolerance" policy regarding inappropriate relationships with patients, and Mr. Calicutt was instructed that any sexual activity with any resident is forbidden. Prior to the incident reported by Ms. Banuelos on January 8, 2019, Rolling Hills had not received any information or report that Mr. Calicutt had engaged in any inappropriate sexual relationship or activity with any resident. Because Rolling Hills had no notice of any improper behavior, it had no had reason to believe Mr. Calicutt would create an undue risk of harm to any resident. Consequently, it was not negligent in supervising or retaining Mr. Calicutt.

Rolling Hills had no prior knowledge of any propensity Mr. Calicutt may have had to engage in an inappropriate sexual relationship with a resident. Accordingly, is entitled to judgment as a matter of law on the claim for negligent, hiring, retention, and supervision.

### C. Negligence *per se*.

Ms. Banuelos asserts a negligence *per se* claim based on alleged violations of the Oklahoma Child Care Facilities Licensing Act, Okla. Stat. tit. 10 § 401, *et seq.* ("OCCFLA"). The negligence *per se* doctrine substitutes a statutory standard of care for the traditional common law reasonableness standard. *Howard v. Zimmer, Inc.*, 2013 OK 17, ¶ 13, 299 P.3d 463, 467. To establish negligence *per se*, the plaintiff must demonstrate: (1) the injury was caused by violation

of the statute; (2) the injury was of the type intended to be prevented by the statute; and (3) that the injured party was one of the class intended to be protected by the statute. *Id*.

The OCCFLA was passed to "[e]nsure maintenance of minimum standards for the care and protection of children away from their own homes" and "[w]ork for the development of sufficient and adequate services for childcare." Okla. Stat. Ann. tit. 10, § 401. It does not contain a fixed or defined standard of care. Instead, it directs the Oklahoma Department of Human Services ("DHS") to "promulgate rules establishing minimum requirements and desirable standards as may be deemed necessary or advisable to carry out the provisions of the Oklahoma Child Care Facilities Licensing Act." *Id*., § 404(C).

A reasonable jury could conclude that Ms. Banuelos was a member of the class intended to be protected by the statute. The OCCFLA was passed to "[e]nsure maintenance of minimum standards for the care and protection of children away from their own homes," and Ms. Banuelos was a child in the care and protection of Rolling Hills. *See* Okla. Stat. Ann. tit. 10, § 401. But even if a reasonable jury could conclude the injury suffered by Ms. Banuelos (sexual assault) was a health and safety hazard the OCCFLA sought to prevent, it could not find that the injury was caused by a violation of the OCCFLA. Ms. Banuelos broadly asserts that Rolling Hills' conduct violated the OCCFLA, but she has not identified any specific provision alleged to have been violated. Vague references to an entire statutory scheme are insufficient. *See Bristow First Assembly of God v. BP p.l.c*., 210 F. Supp. 3d 1284, 1294 (N.D. Okla. 2016) ("Plaintiffs have not identified any particular state statute, rule, or regulation which BP or any of the other Operational Defendants violated."); *Dailey v. Alvarado*, 2014 WL 12771133, at *1 (W.D. Okla. July 25, 2014) ("Plaintiffs' failure to point to or allege the violation of any particular state or federal statute

10

provides the Court with no basis from which to draw an inference that the defendants could be liable for negligence per se.").

Further, Ms. Banuelos has not cited any case in which a party has brought a negligence *per se* claim based an alleged violation of the OCCFLA, and no provision therein suggests it created a private right of action. Instead, any person who violates the OCCFLA is guilty of a misdemeanor, and if an agent of a child care facility violates the OCCCFLA, the facility's license may be revoked. Okla. Stat. Ann. tit. 10, § 410. Where a criminal or regulatory statute requires or prohibits conduct, it may be used to impose civil liability only where the court concludes the statute is appropriate and applicable. *Busby v. Quail Creek Golf & Country Club*, 1994 OK 63, 885 P.2d 1326, 1329; *Chartney v. City of Choctaw*, 2019 OK CIV APP 26, ¶ 10, 441 P.3d 173, 177 ("[T]he trial court erred in submitting the negligence per se instruction . . . because it has no application to the facts and issues at hand."). The Court concludes the OCCFLA has no application to this case.

Ms. Banuelos has failed to establish that her injuries were caused by violation of the OCCFLA. Accordingly, Rolling Hills is entitled to judgment as a matter of law on the negligence *per se* claim.

### D. Breach of fiduciary duty.

Ms. Banuelos also asserts a claim for breach of fiduciary duty based on the custodian role Rolling Hills assumed over her upon entry to the facility. As a general rule, "[o]ne standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation . . . . [T]he liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." *Schovanec v. Archdiocese of Oklahoma City*, 2008 OK 70, ¶ 43, 188 P.3d 158, 174 (citation omitted). A fiduciary relationship "exists between two persons when one of them is under a duty

11

to act for or to give advice for the benefit of another upon matters within the scope of that relation." *Id*. To succeed on a claim of breach of fiduciary duty, a plaintiff must establish: "(1) the existence of a fiduciary relationship; (2) a breach of a fiduciary duty; and (3) the breach of a fiduciary duty was the direct cause of damages." *Sw. Orthopaedic Specialists, P.L.L.C. v. Allison*, 2018 OK CIV APP 69, ¶ 20, 439 P.3d 430, 436.

Rolling Hills claims it did not breach any fiduciary duty it may have owed to Ms. Banuelos, but once more, a reasonable jury could conclude Rolling Hills breached its fiduciary duty to Ms. Banuelos when it failed to designate her as a SAO victim despite her history of sexual abuse. This failure arguably led to inadequate supervision and monitoring of Ms. Banuelos, which created scenarios in which the sexual assaults could occur. Rolling Hills also asserts that even if it did breach its fiduciary duty, Mr. Calicutt was a supervening cause which insulates it from liability. Rolling Hills provides no authority for the proposition that the supervening cause doctrine from general negligence law is applicable to a breach of fiduciary duty claim. Even assuming the doctrine were applicable, though, as analyzed above, the Court rejects this argument because a reasonable jury could conclude that the sexual assault was reasonably foreseeable. *See Franks*, 1997 OK 105, ¶ 9, 943 P.2d at 614. Rolling Hills is not entitled to summary judgment on the breach of fiduciary duty claim.

**II.    Acadia.**

Ms. Banuelos seeks to impose liability on Acadia by asserting Rolling Hills is its alter ego, while Acadia replies that it and Rolling Hills are wholly separate legal entities. The Tenth Circuit has cautioned that "the corporate veil should be pierced only reluctantly and cautiously." *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993). Indeed, "one of the

recognized purposes of incorporation is to permit persons to avoid personal liability." *Kenkel v. Parker*, 2015 OK 81, ¶ 13, 362 P.3d 1145, 1149.

As a general rule under Oklahoma law, each corporation is a separate and distinct legal entity. *Fanning v. Brown*, 2004 OK 7, ¶ 16, 85 P.3d 841, 846. One circumstance, however, where a court may choose to disregard the corporation form occurs when one entity becomes the "alter ego" of another. *Id*. To impose this remedy, "it must appear that one corporation is merely a dummy or sham." *Gulf Oil Corp. v. State*, 1961 OK 71, ¶ 15, 360 P.2d 933, 936. The issue of whether one entity may be held liable for the acts of another under an alter ego theory "hinges primarily on control." *Frazier v. Bryan Mem'l Hosp. Auth.*, 1989 OK 73, ¶ 17, 775 P.2d 281, 288. To make this determination, a court may consider several factors:

> [W]hether (1) the parent corporation owns all or most of the subsidiary's stock, (2) the corporations have common directors or officers, (3) the parent provides financing to its subsidiary, (4) the subordinate corporation is grossly undercapitalized, (5) the parent pays the salaries, expenses or losses of the subsidiary, (6) almost all of the subsidiary's business is with the parent or the assets of the former were conveyed from the latter, (7) the parent refers to its subsidiary as a division or department, (8) the subsidiary's officers or directors follow directions from the parent corporation and (9) legal formalities for keeping the entities separate and independent are observed.

*Id*. Applying these factors to the present case, the Court concludes Rolling Hills is not the alter ego of Acadia.

<u>Whether the parent corporation owns all or most of the subsidiary's stock</u>. Acadia owns 100% of the limited liability company interests in Rolling Hills. This factor supports Ms. Banuelos' position.

<u>Whether the corporations have common directors or officers</u>. Acadia and Rolling Hills have some corporate officers in common. The Rolling Hills CEO and CFO, who control and

manage the Rolling Hills facility, are not officers of Acadia. This factor supports Ms. Banuelos' position.

<u>Whether the parent provides financing to its subsidiary</u>. Acadia generally does not provide Rolling Hills financing for expenses or non-routine capital items. This factor supports Acadia's position.

<u>Whether the subordinate corporation is grossly undercapitalized</u>. Rolling Hills is adequately capitalized and profitable. This factor supports Acadia's position.

<u>Whether the parent pays the salaries, expenses or losses of the subsidiary</u>. Acadia generally does not provide Rolling Hills financing for expenses or non-routine capital items. Acadia does not fund Rolling Hills' salaries or operating expenses. This factor supports Acadia's position.

<u>Whether almost all of the subsidiary's business is with the parent or the assets of the former were conveyed from the latter</u>. Rolling Hills' business is not primarily with Acadia, and no assets owned by Rolling Hills have been conveyed to Acadia. It is Rolling Hills, and not Acadia, which holds the license to operate the Residential Child Care Facility at issue. This factor supports Acadia's position.

<u>Whether the parent refers to its subsidiary as a division or department</u>. As noted above, Acadia and Ms. Banuelos dispute this fact. At this stage, the Court views evidence and makes inferences in a light most favorable to Ms. Banuelos. Acadia operates Rolling Hills in part through its Governing Board, which includes a "Division President" and "Division Clinical Director," and the CEO of Rolling Hills reports directly to the Division President. For the purposes of this summary judgment analysis, the Court assumes Acadia has referred to Rolling Hills as a division. This factor supports Ms. Banuelos' position.

<u>Whether the subsidiary's officers or directors follow directions from the parent corporation</u>.  The CEO and CFO of Rolling Hills are not officers of Acadia and have authority to control and manage the Rolling Hills facility.  If Rolling Hills performs an internal investigation regarding a sexual assault incident, it is not permitted to share its findings to a third-party without express authorization from Acadia.  Rolling Hills' risk management policies, practices, and procedures are provided by Acadia.  If Rolling Hills is sued, Acadia choses which legal counsel will provide the defense.  Ultimately, while Acadia does provide specific directions in certain scenarios, Rolling Hills' officers have general authority to control and manage the Rolling Hills facility.  This factor supports Acadia's position.

<u>Whether legal formalities for keeping the entities separate and independent are observed</u>.  Rolling Hills maintains its own books and records separate and distinct from those of Acadia, and the two entities observe separate legal and accounting formalities.  This factor supports Acadia's position.

Overall, Rolling Hills is not the alter ego of Acadia.  All factors weigh in favor of Acadia except its ownership of the limited liability company interests in Rolling Hills, its sharing of some corporate officers with Rolling Hills, and its reference to Rolling Hills as a division.  This is insufficient to disregard the corporate form and hold Acadia liable for the acts of Rolling Hills. *See Key v. Liquid Energy Corp*., 906 F.2d 500, 503 (10th Cir. 1990) ("[T]he fact that a corporation owns all of the stock of another corporation does not destroy the identity of the latter as a distinct legal entity . . . and the fact that stockholders or officers of two corporations may be the same persons does not operate to destroy the legal identity of either corporation."); *Luckett v. Bethlehem Steel Corp*., 618 F.2d 1373, 1379 (10th Cir. 1980) ("It is necessary to establish something more than ownership of virtually all of the subsidiary stock by the parent or identity of directors in order

15

to treat the parent and subsidiary as one."); *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1364 (10th Cir. 1974) ("[I]dentity of officers and directors has been held insufficient to allow corporate veil piercing."). There is nothing to suggest that Rolling Hills "is merely a dummy or sham." *See Gulf Oil Corp.*, 1961 OK 71, ¶ 10, 360 P.2d at 936. Significantly, Acadia did not exercise control over Rolling Hills such that Rolling Hills was merely its instrumentality. The CEO and CFO of Rolling Hills are neither employed by nor officers of Acadia, and they have authority to control and manage the Rolling Hills facility. Rolling Hills is not the alter ego of Acadia.

### III.    Procedural Issues.

Additionally, in response to both Motions for Summary Judgment, Ms. Banuelos raises two procedural issues. She asks the Court to stay resolution of the motions pursuant to Fed. R. Civ. P. 56(d), and also moves for sanctions due to alleged discovery abuses. Neither request is properly presented, and both are denied.

First, Ms. Banuelos asks the Court to defer ruling on the motions to allow her more time engage in discovery. Where a party cannot present facts essential to justify its opposition to a motion for summary judgment, Rule 56(d) allows a court to defer ruling on the motion while that party takes necessary discovery. A request under Rule 56(d), however, should be presented independent from a response on the merits, not as a tag-along argument to a substantive response. *See Network Com., Inc. v. Microsoft Co*rp., 260 F. Supp. 2d 1042, 1047 (W.D. Wash. 2003) (denying request for a continuance where plaintiff "did not request this continuance at the time it was served with this Motion on November 22, 2002, but rather waited until filing its Opposition on February 3, 2003."). A request for more time under Rule 56(d) "is an *alternative* to a response in opposition to summary judgment under 56(e) and is designed to safeguard against a premature or improvident grant of summary judgment." *Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 833 (10th Cir. 1986) (emphasis in original). If the party seeking Rule 56(d) relief "has been

16

dilatory . . . no extension will be granted." *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554 (10th Cir. 1993). Ms. Banuelos' untimely request for a stay under Rule 56(d), contained within her substantive response, is denied.

Second, Ms. Banuelos requests sanctions due to alleged discovery abuses. She alleges that Rolling Hills and Acadia failed to preserve video evidence of she and Mr. Calicutt entering the laundry room prior to the sexual assault. As an initial matter, Local Civil Rule 7.1(d) provides that "[a] response to a motion may not also include a motion or a crossmotion made by the responding party." Further, "[e]ach motion, application or objection filed shall be a separate pleading, except where alternative pleading is allowed by law or these Rules." LCvR 7.1(b). The Court has already advised Ms. Banuelos about these Local Rules when she has elsewhere violated them. *See* Dkt. No. 125. Her motion for sanctions, contained within her substantive response, is improper.

Further, spoliation sanctions may be proper where: "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007). As it pertains to these motion, Ms. Banuelos cannot show she has suffered any prejudice by the destruction of the video footage. For purposes of summary judgment, Rolling Hills does not dispute Ms. Banuelos was sexually assaulted nor does it dispute that the assault occurred in the location and manner as alleged by Ms. Banuelos. Video surveillance of the two entering the laundry room would be cumulative to the pending motions. The Court declines to deny these motions due to spoliation of evidence.

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment of Rolling Hills Hospital, LLC [Dkt. No. 188], is GRANTED IN PART AND DENIED IN PART. Rolling Hills is entitled to judgment in its favor on the claims for negligent hiring, retention, and supervision

and negligence *per se*. Rolling Hills is not entitled to judgment in its favor on the claims for negligence and breach of fiduciary duty. In addition, the Motion for Summary Judgment of Acadia Healthcare Company, Inc. [Dkt. No. 189], is GRANTED.

Dated this 30th day of September 2025.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE